UNITED STATES DISTRICT COURT ONLINE PUBLICATION ONLY
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------- X
: 
CHRISTOPHER PRINCE, :
:
:
                      *Petitioner,* :
: MEMORANDUM AND ORDER
      - against - :
: 10-CV-5306 (JG)
WILLIAM LEE, :
:
:
                   *Respondent.* :
----------------------------------------------------------------- X

A P P E A R A N C E S:

    CHRISTOPHER PRINCE
        # 04-R-1765
        Green Haven Correctional Facility
        P.O. Box 4000
        Stormville, New York 12582-0010
        *Petitioner, pro se*

    ERIC T. SCHNEIDERMAN
        Attorney General of the State of New York
        120 Broadway
        New York, New York 10271
    By:    Lisa Ellen Fleischmann and Alyson J. Gill
        *Attorneys for Respondent*

JOHN GLEESON, United States District Judge:

        Christopher Prince petitions for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Prince challenges his April 2004 conviction in New York State Supreme Court, Queens County, of criminal possession of a weapon in the third degree pursuant to New York Penal Law § 265.02(4).[1] Appearing *pro se*, Prince seeks habeas relief on the grounds that there was insufficient evidence supporting his conviction and he was denied effective assistance of appellate counsel. Oral argument was heard on April 5, 2011, at which Prince appeared via

---

[1]     Subsection 265.02(4) was repealed as of November 1, 2006. L.2006, c. 742, § 1.

videoconference from his place of incarceration. Prince's reply brief, dated April 4, 2011, reached the Court on April 8, 2011, and I considered it in arriving at my decision on Prince's petition. For the reasons stated below, the petition is denied.

BACKGROUND

A. *The Offense Conduct*

The evidence at trial established that late in the evening on March 19, 2003, Prince answered his girlfriend Natalie Smith's cell phone while at her house in Queens. The caller was Smith's ex-boyfriend, Orville Mongol. Mongol became upset when he heard a male voice answer Smith's phone, and he asked to speak to Smith. After the call ended, Ian Burke, a friend of Mongol who was with him at the time, attempted to calm Mongol down. Mongol then drove to Smith's house with Burke and Burke's girlfriend in his truck, double parked on Smith's street, and exited the truck with the engine still running while Burke moved to the back seat with his girlfriend. Mongol knocked on Smith's door, and when no one answered he yelled to Smith to open the door. After Smith refused, Mongol yelled to Jennifer Turner – the owner of Smith's building – to open the door, and she complied. As Turner opened the door, Prince ran down the stairs behind her and attempted to exit the building through the front door. Mongol demanded to know Prince's name and blocked his exit.

Mongol and Prince then walked down the house's steps and onto the sidewalk, where their conflict escalated. At some point during or shortly after his walk down the steps to the sidewalk, Prince put his hand in his back pocket. He then walked past Mongol's vehicle and into the street, while Mongol walked toward the back of the vehicle. Prince then quickly turned around so he was facing Mongol, pointed a gun at Mongol and fired at him. Mongol hid behind the side of his truck, and at that point, Prince ran across the street and fired another shot after

several failed attempts to cock the gun. Mongol then tried to get back into his truck and drive after Prince, who was running away, but Burke stopped Mongol by putting his foot on the brake and wrestling with Mongol to keep him out of the vehicle.

After Prince fled, the police arrived, patted down Mongol, and elicited a statement from him. Detective Steven DeLuca told Mongol to call him if he saw Prince again and to avoid speaking to Prince. After Mongol's second sighting of Prince at a night club, Mongol called DeLuca to notify him that he had seen Prince twice. Mongol subsequently found Prince's cell phone number on Smith's cell phone while at a party for his and Smith's daughter, and he provided that phone number to DeLuca. On May 5, 2003, DeLuca called Prince and arranged to meet him in front of his house. Prince arrived at the specified time with Smith, and agreed to accompany DeLuca to the police precinct, where DeLuca arrested him.

B.  *Procedural History*

1.  *The Trial and Sentencing*

Prince proceeded to a jury trial before Justice Barry Kron of the New York State Supreme Court, Queens County. Mongol, Burke, Detectives DeLuca and Vincent Papasodero, and Police Officer Michael DeBonis testified for the People. The defense called Smith, Turner and Andrew Stephenson, whom Prince had called on the night of the shooting to pick him up and give him a ride home, and who witnessed Prince and Mongol's altercation but did not see who fired the gunshots. On March 23, 2004, the jury returned a verdict acquitting Prince of attempted murder of Mongol, criminal possession of a weapon in the second degree and reckless endangerment, but convicting him of criminal possession of a weapon in the third degree. On April 20, 2004, Justice Kron sentenced Prince to four years' imprisonment and three years' post-release supervision.

2.  *The Direct Appeal*

Prince appealed from the judgment of the Supreme Court on the ground that the jury verdict was against the weight of the evidence. The People construed Prince's argument to include a legal sufficiency challenge to his conviction as well as a request for a new trial on the ground that the guilty verdict was against the weight of the evidence. On October 7, 2008, the Appellate Division, Second Department, affirmed Prince's conviction, rejecting his legal sufficiency claim as both unpreserved and lacking in merit. *See People v. Prince*, 864 N.Y.S.2d 331, 331 (2d Dep't 2008) ("[W]e find that [the evidence] was legally sufficient to establish the defendant's guilt beyond a reasonable doubt."). The court also exercised its factual review power and held that the guilty verdict was not against the weight of the evidence. *Id.*

Prince applied for leave to appeal from this decision but a judge of the Court of Appeals denied his application on June 30, 2009. *People v. Prince*, 11 N.Y.3d 929 (2009) (Read, J.).

3.  *The Motion for a Writ of Error Coram Nobis*

On January 8, 2010, Prince moved *pro se* in the Appellate Division for a writ of error coram nobis, contending that his appellate counsel was constitutionally ineffective in that she failed to argue (1) that the trial court improperly swore prospective jurors; (2) that the prosecutor violated *Batson v. Kentucky*, 476 U.S. 79 (1986) in exercising her peremptory challenges to strike prospective jurors from the panel; (3) that trial counsel was ineffective in failing to object to the manner in which the trial court handled jury notes, which, Prince argued, violated New York law; (4) that trial counsel was ineffective in failing to preserve the legal sufficiency claim; and (5) anything other than the unpreserved legal sufficiency claim on appeal.

The Appellate Division denied Prince's application on June 29, 2010, holding that Prince had "failed to establish that he was denied the effective assistance of appellate counsel." *People v. Prince*, 903 N.Y.S.2d 263, 263 (2d Dep't 2010) (citations omitted). Prince then petitioned for leave to appeal from this decision, but on September 17, 2010, a judge of the Court of Appeals denied his application. *People v. Prince*, 15 N.Y.3d 855 (2010) (Graffeo, J.).

4.  *The Instant Petition*

Prince filed this petition *pro se* on November 15, 2010, claiming that he is entitled to a writ of habeas corpus under 28 U.S.C. § 2254 because (1) the evidence adduced at his trial was insufficient to sustain his conviction; and (2) he was denied the effective assistance of appellate counsel because counsel failed to argue that (a) the prospective jurors were improperly sworn; (b) the prosecutor's peremptory challenges to the jury panel violated *Batson v. Kentucky*; (c) the trial court violated New York law governing the protocol for jury notes and jury read-back requests; and (d) trial counsel was ineffective for not having preserved the foregoing claims in the proceedings below. Finally, Prince claims he was denied the effective assistance of appellate counsel because his counsel raised only an unpreserved claim on direct appeal.

DISCUSSION

A. *Standard of Review*

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") narrowed the scope of federal habeas review of state convictions where the state court has adjudicated a petitioner's federal claim on the merits. 28 U.S.C. § 2254(d). Under the AEDPA standard, the reviewing court may grant habeas relief only if the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," *id.* § 2254(d)(1), or "was based on an unreasonable

determination of the facts in light of the evidence presented in the State court proceeding," *id.* § 2254(d)(2).[2]

The Supreme Court has interpreted the phrase "clearly established Federal law" to mean "the holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *see also Gilchrist v. O'Keefe*, 260 F.3d 87, 93 (2d Cir. 2001). A decision is "contrary to" clearly established federal law if "the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." *Williams*, 529 U.S. at 413. A decision is an "unreasonable application" of clearly established federal law if a state court "identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of [a] prisoner's case." *Id.* "In other words, a federal court may grant relief when a state court has misapplied a 'governing legal principle' to 'a set of facts different from those of the case in which the principle was announced.'" *Wiggins v. Smith*, 539 U.S. 510, 520 (2003) (quoting *Lockyer v. Andrade*, 538 U.S. 63, 76 (2003)).

Under the "unreasonable application" standard set forth in *Williams*, "'a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable.'" *Gilchrist*, 260 F.3d at 93 (quoting *Williams*, 529 U.S. at 411). Elaborating on this standard, the Supreme Court has held that a habeas court may only "issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's

---

[2] This limitation on relief is referred to as "AEDPA deference." *E.g.*, *Jimenez v. Walker*, 458 F.3d 130, 135 & n.2 (2d Cir. 2006).

6

precedents." *Harrington v. Richter*, 131 S. Ct. 770, 786 (2011); *see also id.* at 786-87 (a state prisoner seeking federal habeas relief "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement"). "[E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* at 786.

AEDPA's limited scope of review applies whenever a state court disposes of a state prisoner's federal claim on the merits and reduces its disposition to judgment, regardless of whether it gives reasons for its determination or refers to federal law in its decision. *See Richter*, 131 S. Ct. at 785; *Sellan v. Kuhlman*, 261 F.3d 303, 312 (2d Cir. 2001).

In addition to the deference owed to state court determinations of fact under § 2254(d), subsection (e) requires that a federal habeas court presume all state court factual determinations to be correct. The petitioner has the burden of rebutting this presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

B.  *Prince's Claims*

1.  *Sufficiency of the Evidence*

Prince first claims that there was insufficient evidence adduced at trial to support his conviction for criminal possession of a weapon in the third degree.[3] A state habeas petitioner is entitled to the writ if it is found that upon the evidence adduced at trial no rational trier of fact

---

[3] Respondent contends, and the Appellate Division held, that Prince's legal sufficiency claim was procedurally defaulted in the state court proceedings. Based on my review of the record, I find otherwise: at the close of the evidence, Prince's trial counsel moved for dismissal of the People's case on the ground that the People had not "established a prima facie case," and he further argued that "no jury [could find] proof beyond a reasonable doubt" of the crimes charged. Tr. at 824. Counsel's motion appears to me to constitute a sufficiency challenge, and I therefore disagree with Respondent and the Appellate Division that this claim was procedurally defaulted. In any event, I need not address Respondent's procedural argument because I conclude that Prince's legal sufficiency claim is without merit. In light of my rejection of the legal sufficiency claim, I need not consider Respondent's additional contention that Prince's "weight of the evidence" claim is not cognizable on federal habeas review.

7

could have found proof of guilt beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 324 (1979); *see also id.* at 319 ("[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."). Guilt beyond a reasonable doubt may be established entirely by circumstantial evidence, and such evidence must be reviewed not piecemeal, but as a whole. *Maldonado v. Scully*, 86 F.3d 32, 35 (2d Cir. 1996). The petitioner bears a "very heavy burden" in convincing a federal habeas court to grant his petition on the ground of insufficient evidence. *Ponnapula v. Spitzer*, 297 F.3d 172, 179 (2d Cir. 2002) (quotation marks omitted).

At the time of Prince's conviction, New York Penal Law § 265.02(4) provided that a person is guilty of criminal possession of a weapon in the third degree when "[s]uch person possesses any loaded firearm" other than "in such person's home or place of business." The People therefore were obligated to prove beyond a reasonable doubt that Prince possessed a loaded firearm, and that at the time of such possession, he was not in his home or place of business. Prince argues that there was insufficient proof of his possession of the gun, focusing primarily on the lack of credibility of the People's witnesses. He notes that only Mongol and Burke testified to his possession of the gun, and asserts that Mongol's testimony was incredible because Mongol had a motive to blame Prince, Mongol was the true aggressor in the incident, and Mongol's testimony was ridden with inconsistencies and contradictions, especially regarding the number of gunshots he heard. Pet. at 4. Prince also attaches significance to the absence of evidence reflecting that the gun attributed to him had been fired, and to the jury's decision to convict him only of criminal possession of a weapon in the third degree, despite his having been charged with more severe offenses. *Id.*

8

The Appellate Division found, upon "viewing the evidence in the light most favorable to the prosecution, and drawing all reasonable inferences in the prosecution's favor," that the evidence "was legally sufficient to establish the defendant's guilt beyond a reasonable doubt." *People v. Prince*, 864 N.Y.S.2d at 331. I agree with this conclusion. Although Mongol and Burke presumably sought to vindicate their own interests at trial, it was the jury's province to determine the credibility of these witnesses and to decide which version of the facts to accept, and its decisions in this regard are entitled to deference. *See, e.g.*, *Maldonado*, 86 F.3d at 35 ("[A]ssessments of the weight of the evidence or the credibility of witnesses are for the jury . . . ; we defer to the jury's assessments of both of these issues."). Mongol's and Burke's testimony that they saw Prince pull out a gun and aim it at Mongol, and that they heard two gunshots thereafter, was sufficient evidence of Prince's possession of the weapon. I further note that their testimony was consistent with that of Turner, Stephenson, and Vernelle Phillips and Christopher Phillips, Smith's neighbors who heard the two gunshots and called 911.

For these reasons, I conclude that the Appellate Division's decision rejecting Prince's sufficiency challenge was not an unreasonable application of clearly established federal law.

2. *Ineffective Assistance of Counsel*

Prince asserts that his appellate counsel's errors amounted to constitutionally ineffective assistance of counsel. In order to establish that his counsel was ineffective, he must prove that (1) counsel's performance fell below an objective standard of reasonableness, and (2) there is a reasonable probability that, but for counsel's errors, the result of the appeal would have been different. *Strickland v. Washington,* 466 U.S. 668, 687-94 (1984); *see Smith v. Murray*, 477 U.S. 527, 535-36 (1986) (*Strickland* test applies to evaluate effectiveness of appellate

counsel); *see also Harrington v. Richter*, 131 S. Ct. at 792 (in order to satisfy the prejudice prong of the *Strickland* test, "[t]he likelihood of a different result must be substantial, not just conceivable"). The relevant question for a habeas court reviewing a state court's dismissal of an ineffective assistance of counsel claim "is not whether counsel's actions were reasonable," but "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Richter*, 131 S. Ct. at 788.

      a.    *The Swearing of Prospective Jurors*

Although the transcript of Prince's trial was amended to reflect that the entire venire was sworn upon entering the courtroom for the first time, Prince nevertheless contends that his rights to a fair trial and to an impartial jury were violated due to other omissions in the swearing process. Specifically, Prince claims that there is no record of an oath being given to the "three individual panels of jurors," and that the jurors who formed the petit jury – including those who replaced prospective jurors who were dismissed for cause or pursuant to peremptory challenges – were not sworn "again prior to trial." Pet. at 10-11. In his reply brief, Prince elaborates on this claim, contending that the jury was not properly warned to avoid being "influence[d] by non-court matters such as reading the paper or watching TV, where aspect[s] of the case could be broadcast." Prince Reply Br. at 5.

New York Criminal Procedure Law § 270.15 provides that a panel of prospective jurors "shall be immediately sworn to answer truthfully questions asked them relative to their qualifications to serve as jurors in the action," and that "[t]he prospective jurors who are not excluded from service must retain their place in the jury box and must be immediately sworn as trial jurors" to "try the action in a just and impartial manner, to the best of their judgment, and to render a verdict according to the law and the evidence." N.Y. Crim. Proc. Law § 270.15(1)(a),

(2). The court complied with this provision by immediately administering the oath to the prospective jurors when they first entered the courtroom. Ex. G to Fleischmann Decl., at 12 (stating that trial record was recently amended before Justice Kron to officially read, "Whereupon the jury was sworn in by the Clerk of the Court"). In addition, the record reflects that the final 12 members of the jury were sworn prior to trial. Tr. at 232[4] (stating, "[w]hereupon, the jurors were sworn in"). As a result, it appears that the trial court complied with the applicable state law provisions regarding administration of the oath to jurors, and Prince's arguments to the contrary are baseless.

Furthermore, the court adequately instructed the 12 selected jurors to shield themselves from outside influences on their deliberations, stating, after swearing them: "Anything about the case reported in the press, studiously avoid it. It has nothing to do with your job as [regards] reaching a verdict, which is [to] base your verdict solely and exclusively on what you hear in the courtroom during the trial." *Id.* at 233. At defense counsel's request upon the publication of certain newspaper articles about Prince's case, the trial court again instructed the jury on this issue in its jury charge. *Id.* at 956-57 ("I simply reiterate, because it is so important that I keep reiterating this, that everything involved in the deliberations has to be based solely and exclusively on the evidence you have heard during this trial from the witnesses, which is . . . the sole thing that your verdict can be based on and cannot in any way be based on anything written in the newspaper, an article or anything else that you might have been exposed to.").

In light of the foregoing, Prince's appellate counsel's decision not to raise this issue on direct appeal did not fall below an objective standard of reasonableness. Counsel had no constitutional "duty to raise every colorable claim suggested by" Prince, *Jones v. Barnes*, 463

---

[4] Citations to the trial transcript are preceded by "Tr."

U.S. 745, 754 (1983) (quotation marks omitted), and counsel may well have decided that a weak claim regarding the jury oath was not worth asserting. Moreover, there is no indication that the appeal would have succeeded had counsel raised this claim. I accordingly find that the Appellate Division's rejection of this ineffective assistance of counsel claim on Prince's coram nobis motion was not an unreasonable application of federal law.

          b.     *The Prosecutor's Peremptory Challenges to Prospective Jurors*

Prince also claims that his appellate counsel was ineffective for not having argued on appeal that the prosecutor's use of her peremptory challenges against prospective jurors was racially discriminatory in violation of *Batson v. Kentucky*, 476 U.S. 79 (1986). A defendant raising a *Batson* objection to a prosecutor's use of her peremptory challenges must first establish a prima facie case of racial discrimination, which involves showing that he is a member of a cognizable racial group and presenting facts and any other relevant circumstances – such as the prosecutor's "'pattern' of strikes against black jurors" in the venire – which "raise an inference that the prosecutor used that practice to exclude [members of the venire] from the petit jury on account of their race." *Id.* at 96-97. Once the defendant has done so, the prosecutor must "come forward with a neutral explanation for challenging black jurors" that is related to the case at bar. *Id.* at 97. The trial judge then must determine whether the defendant has established purposeful discrimination after "undertak[ing] a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Id.* at 98, 93 (quotation marks omitted). *Batson* requires the judge "to take into account all possible explanatory factors in the particular case[;]" for example, "where the explanation for a peremptory challenge is based on a prospective juror's demeanor, the judge should take into account, among other things, any observations of the juror

that the judge was able to make during the *voir dire*." *Thaler v. Haynes*, 130 S. Ct. 1171, 1174 (2010) (per curiam) (quotation marks and brackets omitted).

Here, Prince's trial counsel first objected to the prosecutor's use of her peremptory challenges after she challenged an African-American female juror. Tr. at 168-69. Ostensibly because Prince is African-American, counsel argued that the prosecutor's peremptory challenge of a juror falling under the category of "minorities" or "non-whites" violated *Batson*. *Id.* at 169. The trial court noted that the challenged juror was only the second African-American juror on the panel, that the previous African-American juror had been seated with no objection, and that defense counsel already had challenged three non-white jurors whom the prosecutor had found acceptable. *Id.* at 171-72. Despite the court's conviction that defense counsel had failed to establish a prima facie case of a *Batson* violation, it nevertheless elicited a race-neutral explanation for the peremptory challenge from the prosecutor, who pointed to the juror's statement that she was "a leader to a fault" and to her failure to pay attention to and comprehend the prosecutor's initial questioning. *Id.* at 174. The court then expressed its belief that "the reasons Miss Neustadt has given are sincere," were directed at "the individual person" in question, and were based on "the way she responded" to the prosecutor's questions. *Id.* After the prosecutor's second peremptory challenge of an African-American female juror, defense counsel again raised a *Batson* objection regarding the prosecutor's peremptory strikes of African-American females. *Id.* at 175. After the prosecutor explained that she wished to challenge the juror because she had responded to questions regarding how she would judge the credibility of a witness with a blank stare, *id.* at 176, the court accepted this race-neutral explanation, stating, "I do not believe the reason given is a subterfuge," *id.* When defense counsel attempted to persuade the court that the prosecutor's explanation was illegitimate, the court elaborated on its

thought process, stating: "[i]n sitting here in the courtroom and observing the dynamics between the attorneys and the potential jurors I take that all into account, and I do not believe the striking of Miss Hoppie is a subterfuge." *Id.* at 177. Finally, after the prosecutor struck a fourth female African-American juror, the court initiated its own *Batson* inquiry on the ground that the prosecutor had now exercised her third peremptory challenge against an African-American woman, and the court "believe[d] that is a pattern." *Id.* at 179. The prosecutor responded that she could not get any responses from the juror in question and did not feel as if she could engage her. *Id.* The court then concurred that the juror "had a disengaged demeanor sitting here" and expressly accepted the prosecutor's "reason given as something unrelated to race or gender and again related to the dynamics of the interplay." *Id.* at 179-80.

The record reflects that the trial court took seriously defense counsel's allegations of *Batson* violations and attempted to ferret out any racially discriminatory intent on the part of the prosecutor. The court was ideally situated to judge the credibility of the prosecutor as she explained her reasons for exercising her peremptory challenges against African-American females, and to observe the demeanor of the challenged jurors during voir dire. In addition, the fact that the court raised a *Batson* objection sua sponte after the prosecutor's third peremptory challenge of an African-American woman reflects its dedication to guarding against a *Batson* violation.

In light of the propriety of the trial court's denials of defense counsel's *Batson* objections, I have no difficulty concluding that Prince's appellate counsel's decision not to press a *Batson* claim on appeal fell within the "wide range of professionally competent assistance" guaranteed by the Sixth Amendment. *Strickland*, 466 U.S. at 690. Moreover, as the trial court's rulings on defense counsel's *Batson* objections would have been entitled to deference on appeal,

14

I cannot conclude that the result of Prince's appeal would have been different had appellate counsel pursued a *Batson* claim. I therefore find that the Appellate Division's rejection of this ineffective assistance of counsel claim was not an unreasonable application of federal law.

        c.        *The Trial Court's Failure To Comply with New York Criminal Procedure Law § 310.30*

Prince also takes issue with the manner in which the trial court handled jury notes and read-back requests, and contends that his appellate counsel was ineffective for not having argued on appeal that the court erred in this regard. Specifically, he criticizes the trial court for not returning the jury to the jury room after they made their requests, not giving the prosecution and defense a fair opportunity to respond to such requests, not introducing each read-back or other request as a court exhibit, and failing to exercise its discretion to give the jury a copy of certain state criminal statutes. Pet. at 14.

New York Criminal Procedure Law § 310.30 provides that, upon the jury's request for further instruction or information, "the court must direct that the jury be returned to the courtroom and, after notice to both the people and counsel for the defendant, and in the presence of the defendant, must give such requested information or instruction as the court deems proper." Here, the trial court responded to several of the jury's requests seriatim after bringing the jury into the courtroom, provided the jury with a read-back of Jennifer Turner's testimony after a short delay, and read the jury the New York state statutory definition of reckless endangerment in the first degree in lieu of providing it with a copy of the statute itself. *See* Tr. at 942-48. Although defense counsel encountered obstacles in returning to court upon hearing that the jury had sent the court its first note, the record reflects that counsel was present when the court responded to the jury's requests. Finally, the court was well within its discretion in declining to provide the jury with a copy of the criminal statute defining reckless

endangerment in the first degree, as § 310.30 authorizes but does not require the trial court to "give to the jury copies of the text of any statute which, in its discretion, the court deems proper." N.Y. Crim. Proc. Law § 310.30. The court therefore did not err in its handling of the jury's notes and read-back requests, and Prince's appellate counsel accordingly was not ineffective in failing to raise this argument on appeal.

        d.     *Appellate Counsel's Failure To Argue that Trial Counsel Was Ineffective*

My analysis of Prince's fourth ineffective assistance of counsel claim dovetails with that of his preceding ineffective assistance claims, insofar as Prince cannot prevail on this claim having failed to do so on the others. Just as Prince's appellate counsel acted reasonably in declining to raise the meritless claims discussed above, so was he not required to argue that trial counsel was ineffective in failing to raise such claims. Trial counsel likely saw no error in the court's swearing of the jury or its handling of the jury notes and read-back requests, and to the extent he objected to the prosecutor's use of peremptory challenges, he stated that objection on the record. I presume that appellate counsel concluded that trial counsel's performance in these respects was not objectively unreasonable under *Strickland*, and that trial counsel's advocacy on these issues would not have changed the outcome of the trial. To the extent Prince argues that his appellate counsel should have contended that trial counsel was ineffective in failing to preserve a sufficiency challenge, in my view, Prince's appellate counsel in all likelihood concluded that trial counsel did not perform objectively unreasonably in choosing to pursue a weight of the evidence claim over a sufficiency challenge. As a result, I reject this ineffective assistance of counsel claim as well.

e. *Failure To Raise Any Claims Besides the Weight of the Evidence Claim*

As a final quibble with his appellate counsel's performance, Prince contends that counsel should not have limited her arguments on appeal to "an unpreserved claim." Pet. at 16. Although the Appellate Division deemed Prince's sufficiency challenge unpreserved, the primary claim advanced by counsel on appeal – that the verdict was against the weight of the evidence – was preserved for appellate review. In addition, although Prince faults counsel for failing to raise "more meritorious issues" on appeal, he has failed to convince me that there were any such issues to be raised. For these reasons, the Appellate Division did not unreasonably apply clearly established federal law in rejecting all of Prince's ineffective assistance of counsel claims.[5]

## CONCLUSION

Prince's petition for a writ of habeas corpus is denied. As Prince has failed to make a substantial showing that he was denied a constitutional right, no certificate of appealability shall issue.

So Ordered.

John Gleeson, U.S.D.J.

Date: April 22, 2011
Brooklyn, New York

---

[5] In his reply brief, Prince supplements his ineffective assistance of counsel claims by pointing to his appellate counsel's failure to argue that trial counsel was ineffective in not moving for a dismissal of the indictment at the close of the People's case and/or the defense's case or after summations. Prince Reply Br. at 11. This claim is contradicted by the record, which reflects that Prince's trial counsel moved to dismiss the People's case at the close of the evidence, Tr. at 824, and therefore I reject Prince's argument that his appellate counsel was required to assert ineffective assistance of trial counsel on this basis. Prince also takes issue with his appellate counsel's failure to provide "effective representation" in connection with Prince's coram nobis application. Prince Reply Br. at 12. This claim fails not only because Prince elected to submit that application *pro se*, but also because there is no constitutional right to counsel with respect to such collateral post-conviction proceedings, *see Pennsylvania v. Finley*, 481 U.S. 551, 555-57 (1987); *McKethan v. Mantello*, 292 F.3d 119, 123 (2d Cir. 2002).